Filed 9/10/21  P. v. Omega CA3
Opinion following transfer from Supreme Court

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| THE PEOPLE, | C085437 |
| Plaintiff and Respondent, | (Super. Ct. No. P15CRF0067) |
| v. | |
| NALANA NICOLE OMEGA, | OPINION ON TRANSFER |
| Defendant and Appellant. | |

Defendant Nalana Nicole Omega, along with Raul Gonzalez, Roberto Barrera, Danielle Weed, and Daisy Garcia, robbed and killed victim Pete Thomas in his

1

Placerville home.  A jury found defendant Omega guilty of first degree murder (Pen. Code, § 187, subd. (a))[1] and the trial court sentenced her to 25 years to life in prison.[2]

In June 2019, we affirmed the judgment in an unpublished opinion.  (*People v. Omega* (June 21, 2019, C085437 [nonpub. opn.] (*Omega*).)  In doing so, we rejected the following contentions raised by defendant:  (1) the judgment must be reduced to second degree murder or remanded for a new trial because the jury verdict did not specify the degree of murder, and there was evidence of second degree murder based on the theory of the natural and probable consequences of a conspiracy; (2) the judgment must be reduced to second degree murder due to the failure to comply with section 1157, which requires a finding of the degree of the crime; and (3) the matter must be remanded for a new trial because Senate Bill No. 1437 (2017-2018 Reg. Sess.; Stats. 2018, ch. 1015, eff. Jan. 1, 2019) (Senate Bill No. 1437), which has retroactive effect under *In re Estrada* (1965) 63 Cal.2d 740, abrogated the doctrine of natural and probable consequences liability for murder.  In rejecting these contentions, we concluded that they were all premised on the erroneous assumption that the jury was presented with alternate theories of murder and could have returned a verdict of either first degree or second degree murder.  After reviewing the record, we found no prejudicial error and no need for remand because the trial court instructed the jury on felony murder as the sole theory of murder, and felony murder is first degree murder.  (*Omega, supra*, C085437, at pp. 1, 4-7.)

In October 2019, the Supreme Court granted review.  In February 2021, the matter was transferred back to us with directions to vacate our opinion and reconsider the cause

---

[1] Undesignated statutory references are to the Penal Code.

[2] Gonzalez, Barrera, and Weed were convicted of first degree murder after separate trials.  Their convictions were affirmed on appeal.  (*People v. Barrera, et al.* (July 12, 2019, C085232) [nonpub. opn.]; *People v. Weed* (May 2, 2019, C085254) [nonpub. opn.].)

in light of *People v. Gentile* (2020) 10 Cal.5th 830 (*Gentile*). Thereafter, we requested supplemental briefing from the parties.

We have vacated our prior opinion and reconsidered the appeal in light of *Gentile*. As we shall explain, nothing in *Gentile* persuades us that reversal is warranted under the circumstances of this case. The supplemental briefing merely attempts to relitigate issues already reached and resolved in our original opinion. Because defendant was charged, tried, and convicted *solely* on a felony murder theory, *Gentile* does not apply to this case and we see no error. Accordingly, we affirm.

## FACTS

The following facts are taken from our prior, unpublished opinion affirming defendant's conviction on appeal. (*Omega*, *supra*, C085437.)

"Pete Thomas and his brother Byron, both retired, lived on 26 acres outside of Placerville.[3] Byron and his son lived in a house on the property, while Pete lived in a trailer. The brothers had been close, but after his retirement Pete became very involved with drugs, harming the brothers' relationship.

"Pete was kind hearted and helped others. He was generous and Byron believed others took advantage of him. Conflict between the brothers arose over Pete's 'drug friends' who came over at all hours; some tried to move in with Pete, straining the property's limited water supply. One of those friends was codefendant Weed, who had written Pete letters while she was in jail. The last time Byron saw his brother, Pete was driving off with Weed, who had just been released from jail.

"Pete owned several guns, including an unregistered Glock handgun he claimed he had found in Arkansas. He also had a coin collection, jewelry, a laptop computer, and a cell phone.

---

[3] To avoid confusion, we refer to the Thomas brothers by their first names.

"On February 3, 2015, one of Pete's friends came to Byron's house and told him something had happened to Pete. The friend had already called 911. Byron went to the trailer and saw Pete on the couch with his eyes open. He knew at once that Pete was dead and had been for several days. Pete had blood on his face and shirt, and his hand was clutching a wadded up shirt to his chest. There was blood in the sink, suggesting Pete had suffered from internal bleeding and had been coughing or spitting up blood. Pete had a stab wound to his chest, from which he had bled to death.

"Law enforcement searched the trailer and discovered that Pete's computer, cell phone, and the keys to his car were missing. They collected two drinking glasses and a Styrofoam cup for DNA analysis.

"Alonso Aguilar, a detective with the sheriff's office, knew Daisy Garcia through a family connection. Garcia had reached out to him in the past when she had trouble with the law. On February 8, 2015, she reached out to Aguilar via Facebook. She wanted to talk to him about a homicide. Aguilar was on vacation in Mexico and told her he was unavailable. He called her when he returned and Garcia told him she had information about a murder near Placerville. Aguilar spoke to a supervisor who asked him to arrange a meeting among Aguilar, Garcia, and Detective Netashia Perez.

"Garcia had been using drugs since she was 15 years old and was in court-ordered drug treatment at the time of trial. At the time of the murder, she had been living in a drug flop house. Garcia had grown up with Gonzalez and Barrera and considered them close friends. Gonzalez was dating defendant and they had moved into the flop house and started staying in Garcia's room.

"A few days before the killing, Garcia went with Gonzalez and defendant as they stole a car. Later, Gonzalez and defendant came by and emptied bags of jewelry and coins on the floor of Garcia's room. Garcia was scared of defendant and left for Lake Tahoe for a few days where she partied and used drugs.

4

"On January 31, 2015, Garcia had returned to the flop house and was in her room with Gonzalez, defendant, Barrera, and a man she believed was Gonzalez's uncle; they all were using methamphetamine. Defendant was taking pictures of herself with a gun. The group left and dropped off Gonzalez's uncle. Defendant talked about picking up a girl who was the only one who knew where some house was. Defendant had previously talked about a child molester, she called him a 'chomo,' who had things she wanted to steal. They went and picked up Weed outside a liquor store.

"On the way to Pete's trailer, Weed said she would point out things to steal with her eyes. When she said she was going to kill the man, Gonzalez objected and said no one was getting killed.

"At Pete's, Barrera stayed in the car and Gonzalez handed him the shotgun and told him to stand guard. The others went inside and used drugs with Pete. Gonzalez wanted to buy an ounce of methamphetamine and Pete called someone to arrange a sale. Weed walked around the trailer looking for jewelry and putting it in her pockets.

"The conversation turned to the Glock. Pete did not want to take it out or sell it, but when Garcia returned from the restroom he had it out. Gonzalez asked Garcia to get Barrera. She went to the car and told Barrera that Gonzalez wanted him. Barrera went inside with the gun while Garcia stayed in the car.

"Weed made trips to the car from inside, bringing out Pete's laptop computer, a jewelry box, a box of quarters, and a gun or two. Later, Weed, Gonzalez, defendant, and Barrera ran to the car. Weed had a glove on and was holding a knife. Defendant took the knife and wrapped it in a sweater. Gonzalez said, 'What did that crazy bitch do?' They left Pete's house and stopped at another house where defendant took the sweater inside.

"Gonzalez told Garcia that Weed had stabbed the man. A few days later, Weed admitted to Garcia that she had stabbed Pete.

"The People offered a variety of evidence to corroborate Garcia's testimony. Jeremy Gannon was a former drug dealer who had sold drugs to Pete. On January 31,

5

2015, Pete called him and asked the price for half an ounce of methamphetamine; it was not just for himself.  The call was unusual because Pete usually used text messages and did not purchase that quantity of drugs.  Gannon agreed to meet him at Bucks Bar for the purchase; he waited hours but Pete never showed up.  Gannon later called and texted Pete, but there was no answer.  Cell phone records confirmed these calls.

"Charles Hernandez testified about the flop house he owned.  Garcia had lived there for four months before the killing, later Gonzalez and defendant showed up.  Garcia and defendant did not get along.

"Efren Zamora, Gonzalez's godfather, testified he was with the group that night and they all used methamphetamine.  He claimed he did not see any guns.  He had 'a feeling' that something was going to happen that night and had them drop him off.

"The police conducted a number of searches and found a variety of property consistent with burglaries.  A search of a Honda registered to Gonzalez revealed ammunition, silver pocket knives, jewelry, challenge coins, and a check made out to a Paul Sweeney.  A search of Barrera's residence revealed a shotgun.  During a traffic stop of Gonzalez, defendant, and two others, the police found a handgun and ammunition in defendant's purse.  A backpack in the car contained a revolver, ammunition, and jewelry.  There was a shotgun in the attic of the flop house.  A trunk there contained several bags of jewelry.  Garcia helped Detective Perez find the car used the night of the killing, a silver two-door Hyundai registered to Efren Zamora's wife.

"DNA analysis revealed a profile matching Pete's on one of the glasses taken from the trailer.  A second glass had four contributors and no further analysis could be made.  Weed's DNA profile was consistent with a major contributor to the DNA on the styrofoam cup and defendant could not be excluded as a minor contributor.

"A recording device captured a conversation among Weed, defendant, Gonzalez, and Barrera as they were being transported in a van to the courthouse.  In it, defendant said, 'Hey, we went there for a sack period.  Just stick with that.'  When Barrera claimed

6

he was not there, Gonzalez said he was and Omega said they all were; she said law enforcement had their fingerprints.

"Detective Perez interrogated defendant. Defendant admitted to being with Garcia, Gonzalez, Barrera, and Weed on January 31, 2015. Defendant believed stealing from a child molester was justified. For several weeks before the murder, Weed told her about an old man, a 'chomo,' and that she could get a gun. Defendant said Garcia was in the car during the killing and that Weed had wielded the knife; the knife defendant described was consistent with Pete's wound. Defendant had told Weed to wrap up the knife and throw it away.

"Defendant considered herself the boss and as calling the shots. She claimed they went to Pete's to evaluate his residence for future robberies. She was interested only in the Glock. When arrested, defendant had Pete's Glock; she had taken it from Weed.

"Gina Rutherford met defendant in jail. Defendant was angry that Weed had not been charged. She said they went to a child molester's home and he got stabbed; she thought Weed should be a part of it. Weed had done it. Defendant claimed they went to Pete's for guns and drugs. She said 'chomos' deserve what they get; she sought them out to rob.

"Defendant's conversations with Rutherford were overheard by another inmate who testified defendant told various stories. First, defendant said she did not know why they were arrested; they did not do it. They all went to buy drugs from someone and one of the girls stabbed him; he was a child molester. The next story was that they went there to rob the child molester. Defendant repeatedly made the point the victim was a 'chomo.' She was upset that she got arrested because the victim was a child molester.

"Defendant testified in her defense. She was 34 years old and had used drugs since she was 15. She committed burglaries to support her drug habit. Each job had to net at least $5,000. She found it less offensive to burglarize child molesters. She claimed

7

the group went to Pete's solely to use and buy drugs.  There was no plan or discussion about robbery or burglary." (*Omega, supra*, C085437, at pp. 1-4.)

## DISCUSSION

In her post-transfer supplemental briefing, defendant contends her conviction for first degree murder must be reversed or reduced to second degree murder and the matter remanded for further proceedings.  We disagree.

"Senate Bill 1437 'amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.'  [Citation.]

"To further that purpose, Senate Bill 1437 added three separate provisions to the Penal Code.  First, to amend the felony murder rule, Senate Bill 1437 added section 189, subdivision (e):  'A participant in the perpetration or attempted perpetration of [qualifying felonies] in which a death occurs is liable for murder only if one of the following is proven:  [¶]  (1) The person was the actual killer.  [¶]  (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree.  [¶]  (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2.' . . .

"Second, to amend the natural and probable consequences doctrine, Senate Bill 1437 added section 188, subdivision (a)(3) [citation]:  'Except [for felony-murder liability] as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought.  Malice shall not be imputed to a person based solely on his or her participation in a crime.'

"Third, Senate Bill 1437 added section 1170.95 to provide a procedure for those convicted of felony murder or murder under the natural and probable consequences doctrine to seek relief under the two ameliorative provisions above." (*Gentile, supra*, 10 Cal.5th at pp. 842-843.)

Subdivision (a) of section 1170.95 specifies the conditions that provide a basis for relief under the statute: "A person convicted of felony murder or murder under a natural and probable consequences theory may file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts when all of the following conditions apply: [¶] (1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine. [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder. [¶] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019."

The sentencing court reviews the petition to determine if petitioner has made a prima facie showing for relief and appoints counsel if petitioner so requests. If petitioner makes a prima facie showing, the court must issue an order to show cause. (§ 1170.95, subd. (c).) The court then holds a hearing to determine if petitioner is entitled to relief. (*Id.*, subd. (d)(1).) The burden of proof is on the prosecution to prove beyond a reasonable doubt that petitioner is ineligible for resentencing. (*Id.*, subd. (d)(3).) "The prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens." (*Ibid.*) "If petitioner is entitled to relief pursuant to this section, murder was charged generically, and the target offense was not charged, the petitioner's conviction shall be redesignated as the target offense or underlying felony for resentencing purposes." (*Id.*, subd. (e).)

9

In *Gentile* our Supreme Court concluded that, following the enactment of Senate Bill No. 1437, natural and probable consequences liability cannot extend to second degree murder.  (*Gentile, supra*, 10 Cal.5th at pp. 838-839, 846-848, 851; see *id*. at p. 839 ["Senate Bill 1437 bars a conviction for second degree murder under the natural and probable consequences theory"].)[4]  However, defendant was not convicted of murder under such a theory.  Rather, she was convicted of first degree felony murder, a theory that remains valid after the enactment of Senate Bill No. 1437.  (See *Gentile*, at pp. 842, 846-847, 850; § 189, subd. (e).)  Accordingly, we conclude that reversal of the judgment in this case is not warranted under *Gentile*.  Nothing in that case supports vacating defendant's murder conviction.[5]  Nor is such relief available under Senate Bill No. 1437 on direct appeal from the conviction.  (*Gentile,* at pp. 839, 851-852.)  The sole procedure for that remedy is to file a petition in the sentencing court under section 1170.95.  (*Gentile,* at pp. 839, 852-854, 859; see *id*. at p. 839 ["the procedure set forth in section

---

[4]  In reaching this conclusion, the *Gentile* court noted that in *People v. Chiu* (2014) 59 Cal.4th 155, "we held that natural and probable consequences liability cannot extend to first degree premeditated murder because punishing someone for first degree premeditated murder when that person did not actually perpetrate or intend the killing is inconsistent with 'reasonable concepts of culpability.' " (*Gentile, supra*, 10 Cal.5th at p. 838.)  Thus, following the enactment of Senate Bill No. 1437, a defendant cannot be convicted of first or second degree murder under a natural and probable consequences theory.  (*Gentile*, at pp. 846-849; see *id.* at p. 848 ["Senate Bill. 1437 eliminates natural and probable consequences liability for murder regardless of degree"].)  Except for felony murder, a defendant must possess malice aforethought to be convicted of murder.  (*Id.* at pp. 846-847; see *id.* at p. 847 [in enacting Sen. Bill No. 1437, "the Legislature intended to restrict culpability for murder outside the felony-murder rule to persons who personally possess malice aforethought"].)

[5]  To the extent defendant raises arguments we have previously considered and rejected (i.e., arguments premised on the assertion that the jury was presented with alternate theories of murder and could have returned a verdict of either first or second degree murder), we need not and do not consider those arguments here.  They fail for the reasons set forth in our prior opinion.  (*Omega, supra*, C085437, at pp. 4-7.)

1170.95 is the exclusive mechanism for retroactive relief and thus the ameliorative provisions of Senate Bill 1437 do not apply to nonfinal judgments on direct appeal"].)

For the reasons stated in our prior opinion, (*Omega, supr*a, C085437), we find no prejudicial error and no need for remand and affirm the judgment.

## DISPOSITION

The judgment is affirmed.

/s/
Duarte, J.

We concur:

/s/
Raye, P. J.

/s/
Robie, J.